[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 09-13476
Non-Argument Calendar

————————————————

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 7, 2010
JOHN LEY
ACTING CLERK

Agency No. A098-997-623

REN JIAN CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

————————————————

Petition for Review of a Decision of the
Board of Immigration Appeals

————————————————

(January 7, 2010)

Before TJOFLAT, WILSON and FAY, Circuit Judges.

PER CURIAM:

Ren Jian Chen, *pro se*, petitions for review of the Bureau of Immigration Appeals' ("BIA's") decision affirming the Immigration Judge's ("IJ's") order finding him removable and dismissing his application for withholding of removal and relief under the United Nations Convention Against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). For the reasons set forth below, we deny Chen's petition for review.

## I.

On July 16, 2005, the Immigration and Naturalization Service issued a Notice to Appear, charging that Chen, a native and citizen of China, was subject to removal under INA § 212(a)(6)(A)(i), as an alien who entered the United States without being admitted or paroled. Chen subsequently filed an application for asylum, withholding of removal, and protection under the CAT, alleging that he feared persecution on the basis of his religion and political opinion. Chen later informed the IJ that he was seeking only withholding of removal and CAT relief.

In his application, Chen explained that the Chinese government threatened to abort his girlfriend's baby when she was six or seven months pregnant, and later sought to punish Chen and his girlfriend for having a child out of wedlock. Chen stated that, if he returned to China, he could be imprisoned for violating the family planning policy and punished for leaving China without permission.

In an attachment to his application, Chen explained that he met his

girlfriend, Yun, in February 2004, when she was 18 years old.  Yun discovered that she was pregnant in May 2004.  Yun and Chen eloped and Yun avoided "big hospitals," instead going to private clinics for prenatal check ups to avoid detection by family planning officials.  One evening, on the way to a check up, Chen and Yun saw a village cadre while walking in an alley.  That night, Chen's parents told Chen to take Yun to Chen's sister's home.  Two days later, six family planning officials showed up at Chen's house in an attempt to seize Chen and Yun.  Chen and Yun hid at friends' houses and in small motels.  On February 14, 2005, Yun gave birth to a baby girl in a private clinic.  Chen and Yun discussed leaving China, but Yun refused to leave their child.  On April 20, 2005, Chen flew from Fuzhou to Beijing, then from Beijing to Brazil.  Chen then flew to Guatemala and later traveled to Mexico.  On July 10, 2005, Chen entered the United States.

The record included several pieces of supporting documentation.  The State Department's 2007 Country Report on China noted that national family planning authorities had made some progress on maternal health issues, although "the country's birth limitation policies retain harshly coercive elements in law and in practice."  The Report noted that enforcement of the family planning policies "significantly varied from place to place."  Under the policy, the minimum age for women to marry was 22 and it was illegal in almost all provinces for single women to have a child.  Couples having an unapproved child must pay a social

3

compensation fee, which could be as high as ten times greater than a household's annual disposable income. Fujian province also required "unspecified 'remedial measures' to deal with out-of-plan pregnancies."

The record also included a letter from Yun, who stated that she and Chen had a daughter, Xichen. Yun stated that government officials had threatened her since Chen left China, because she would not give them information on Chen's whereabouts. She stated that the officials told her that they would jail Chen if they found him. The record also contained a birth certificate indicating that Yun Jin Liu, age 20, and Renjian Chen, age 29, had a daughter, Xi Chen, on February 14, 2005. The certificate indicated that the child was born in the general hospital. The original copy of the birth certificate contained both Chinese characters and English translations.

A Form I-213, "Record of Deportable/Inadmissible Alien," dated July 16, 2005, stated that a Border Patrol Agent encountered Chen at a bus station in Harlingen, Texas and discovered that Chen was in the country illegally. Chen told agents that "his main reason for coming to the U.S. was for economic reasons." The form noted that a Department of Homeland Security interpreter had served Chen "in the Chinese language with all service forms regarding his Notice to Appear." The form indicated that Chen had no children.

At a March 12, 2008 hearing before the IJ, Chen testified that he was born in

4

Tantou town, Shi Xia village, which is located in Changle County. Chen testified that, in May 2004, family planning officials and cadres began searching for him because he and Yun had a child illegally. Chen stated that he knew Yun for 10 months before she became pregnant with his child. Yun found out she was pregnant in May 2004. Chen and Yun moved out of town and stayed with a cousin. They could not stay in one place for long periods of time, because they were afraid that officials would notice them. After two months of moving from place to place, Chen and Yun returned to Chen's home, where they stayed for about a week. After one week, officials noticed that Yun was pregnant, and Chen and Yun left again.

Chen stated that, in December 2004, while he was living at his parents' home, family planning officials came to the house, because they wanted Yun to have an abortion. Neither Chen nor Yun were at home when the officials arrived. After Chen's father told him that government officials had accused Chen and Yun of having a child illegally, Chen and Yun again began staying with different friends and relatives and, sometimes, in hotels. Their child was born in a hospital in Tangtou town. After the birth of their child, Chen and Yun remained in hiding because Chen's family members informed him that family planning officials had come to his house to harass him.

Chen testified that he came to the United States because he could not live in

hiding any longer. Chen stated that Yun and his daughter were currently staying in his home with his parents. He explained that, since he left China, officials had come to his family's home and threatened Yun, asking her about his whereabouts. Chen stated that, if he returned to China, he would be arrested by the government and put in jail because he had a child illegally.

On cross-examination, Chen testified that, after leaving China, he remained in Cuba for a little over two months. He acknowledged that his asylum application did not mention that he was in Cuba, and he stated that this was a mistake. Chen stated that his girlfriend was 19 at the time his child was born. He could not explain why his daughter's birth certificate stated that Yun was 20 when she gave birth. Chen testified that he had known his girlfriend for three or four months before she became pregnant. Chen explained that, when he was interviewed by Border Patrol Agents in July 2005, "there was no interpreter and there was no judge." Chen stated that the Border Patrol agent did not speak his dialect, Foo Chow, and he did not know how the agent obtained the information. Chen testified that Chinese officials had refused to register his daughter with the household register, but that his girlfriend had not been physically harmed. He also stated that he thought private clinics and hospitals were the same thing. Chen did not know why Tangtou hospital was not listed on his daughter's birth certificate or why the certificate contained English translations.

6

The IJ found that Chen's testimony "was not sufficiently detailed, consistent, or believable" to support his claim for withholding of removal and CAT relief. The IJ was concerned about the validity of Chen's daughter's birth certificate and discrepancies in Chen's testimony regarding when family planning officials first began harassing him. The IJ also noted that Chen made it very clear in his asylum application that Yun gave birth in a private clinic to avoid detection by family planning officials, but he testified that Yun gave birth in a general hospital and stated that he did not know there was a difference between a general hospital and a private clinic. The IJ noted that he did not give substantial weight to the notation in the I-213 Form that Chen came to the United States for "economic reasons," because it was not clear whether a qualified interpreter was assisting Chen at the time he made the statement.

The IJ determined that, even if Chen's testimony was true, Chen failed to establish that he suffered past persecution or had an objectively reasonable fear of future persecution. He noted that "nothing has happened to [Chen] and nothing has happened to [Yun]," even though Yun continued to reside in the village in which Chen had lived. The IJ also found that Chen "ha[d] not established countrywide persecution." Finally, the IJ determined that Chen failed to establish eligibility for CAT relief, because he failed to show that it was more likely than not that he would be tortured if returned to China.

7

The BIA dismissed Chen's appeal, noting that the IJ found that Chen failed to show past persecution or an objectively reasonable fear of future persecution, even if his testimony was accepted as true. The BIA determined that Chen "ha[d] not demonstrated a likelihood of future persecution based on application of coercive family planning law or policy" and it further found that Chen "ha[d] not established that he more likely than not faces 'torture,' as defined by regulation, upon removal."

## II.

We review only the BIA's decision, except to the extent that the BIA expressly adopts the IJ's opinion or reasoning. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). When considering a petition to review a BIA final order, we review legal issues *de novo*. *Hernandez v. U.S. Att'y Gen.*, 513 F.3d 1336, 1339 (11th Cir.), *cert. denied*, *Hernandez v. Mukasey*, 129 S.Ct. 44 (2008). The BIA's factual findings are reviewed under the substantial evidence test. *Al Najjar*, 257 F.3d at 1283-84. Under this test, we affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1284. "To reverse a factual finding by the BIA, [we] must find not only that the evidence supports a contrary conclusion, but that it compels one." *Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317, 1320 (11th Cir. 2001).

8

As an initial matter, we note that Chen did not apply for asylum, so only his applications for withholding of removal and CAT relief are at issue. Under the INA, an alien shall not be removed to his country of origin if his life or freedom would be threatened in that country on account of race, religion, nationality, membership in a particular social group, or political opinion. INA § 241(b)(3), 8 U.S.C. § 1231(b)(3). "The alien bears the burden of demonstrating that it is more likely than not [that] []he will be persecuted or tortured upon being returned to h[is] country." *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005) (quotations omitted). An alien applying for withholding of removal may satisfy his burden of proof in two ways. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006). "First, an alien may establish 'past persecution in [his] country based on a protected ground.'" *Id.* Second, if the alien does not establish past persecution, he bears the burden of showing that it is more likely than not that (1) he would be persecuted in the future on account of one of the five enumerated grounds; and (2) he could not avoid this future threat to his life or freedom by relocating, if under all the circumstances it would be reasonable to expect relocation. *Id.*, citing 8 C.F.R. § 208.16(b)(2). Congress has provided by statute that forced abortion, forced sterilization, and other coercive population control measures are forms of political persecution. 8 U.S.C. § 1101(a)(42).

When seeking CAT relief, "the burden of proof is on the applicant . . . to

9

establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). "The burden of proof for an applicant seeking withholding of removal under the Convention, like that for an applicant seeking withholding of removal under the statute, is higher than the burden imposed on an asylum applicant." *Al Najjar*, 257 F.3d at 1303.

The BIA did not err in finding that, even if Chen's testimony was credible, Chen failed to establish that he suffered past persecution or would more likely than not be persecuted in the future if returned to China. With respect to past persecution, Chen stated in his asylum application that family planning officials came to his home, attempted to seize him and Yun, and warned his family to "watch out." Chen also testified that family planning officials came to his home in December 2004 because they wanted Yun to have an abortion. These incidents do not constitute past persecution because neither Chen nor Yun were ever physically harmed and the verbal threats Chen described did not rise to the level of persecution. *See Sepulveda*, 401 F.3d at 1231 (stating that menacing telephone calls and threats to family members did not amount to past persecution); *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1290 (11th Cir. 2006) (noting that persecution requires "more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution").

With respect to future persecution, Chen testified that, since he left China,

10

officials had harassed and threatened Yun, asking about his whereabouts. Yun stated, in her letter, that officials threatened to jail Chen if they found him. However, Chen has failed to show that his fear of future persecution is objectively reasonable. Chen testified that Yun and his child have been living with his parents in China. Although officials know where Yun lives, she has not been physically harmed. Since Chen is similarly situated to Yun, it does not appear that he would be physically harmed if he returned to China. Furthermore, Chen's testimony established that he and Yun were harassed by local family planning officials. It appears that officials made no attempts to find Chen other than going to Chen's parents' home. Additionally, the Country Report notes that enforcement of the family planning policy "significantly varied from place to place." Thus, Chen has failed to establish that he would suffer future persecution in China, because he could reasonably avoid any future threat to his life or freedom by relocating within China. *See Tan*, 446 F.3d at 1375; 8 C.F.R. § 208.16(b)(2). Because Chen's testimony failed to establish that he suffered past persecution or would, more likely than not, be persecuted upon returning to China, the BIA correctly denied his application for withholding of removal.

Chen's testimony also failed to establish that he, more likely than not, would be tortured if removed to China. Chen never testified that he had been tortured in the past, and nothing in Chen's testimony or the documentary evidence indicates

that government officials would torture Chen if he returned to China. Accordingly, the BIA did not err in denying Chen's applications for withholding of removal and CAT relief, and we deny Chen's petition for review.

**DENIED.**